## UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

| | | |
|---|---|---|
| TODD DAVID MASSEY, | ) | |
| | ) | |
| Movant | ) | |
| | ) | |
| v. | ) | Civil No. 05-86-P-H |
| | ) | Criminal No. 02-68-P-H |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent | ) | |

## <u>RECOMMENDED DECISION ON 28 U.S.C. § 2255 MOTION</u>

Todd David Massey is serving a 122-month sentence for conspiring to possess

100 kilograms or more of marijuana with the intent to distribute, a charge on which he

entered an open guilty plea. After a direct appeal which was summarily dismissed by the

First Circuit,[1] Massey now seeks collateral relief from his sentence via this 28 U.S.C.

---

[1]      The June 21, 2004, corrected judgment of the First Circuit Court of Appeals reads:

> After a thorough review of the record, we summarily affirm the district court.
> Appellant-defendant Todd David Massey appeals his sentence after pleading guilty to
> conspiracy to possess with intent to distribute at least 100 kilograms of marijuana, in
> violation of U.S.C. § 846 and 841(a)(1). He maintains: (1) that his constitutional rights
> were violated when an assistant United States attorney and a government agent attempted
> to question him without reading him his Miranda rights and without counsel present; (2)
> that he had ineffective assistance of counsel; (3) that the court failed to take into
> consideration the time he was incarcerated when calculating the amount of drugs
> attributable to him; and  (4) that he should have received a full three-point reduction for
> acceptance of responsibility.
>      As to the first issue, when Massey entered an unconditional guilty plea he
> waived all independent non-jurisdictional claims regarding pre-plea conduct of the case.
> See United States v. Rodriguez-Castillo, 350 F.3d 1, 4 (1st Cir. 2003).
>      Secondly, a claim of ineffective assistance of counsel must ordinarily be raised
> first in the district court in a petition for a writ of habeas corpus. See United States v.
> Reyes, 352 F.3d 511, 517 (1st Cir. 2003). This court will permit such a claim to be
> presented in the first instance here only when the critical facts are not genuinely in
> dispute and the record permits a reasoned consideration of the claim. Id. The exception is
> not applicable here.
>      Massey's third claim, that he was held responsible for certain transactions at a
> time when he was jailed, appears to be unsupported by the record because each

§ 2255 motion.  Massey poses seven ineffective assistance of counsel claims and three challenges to this Court's sentencing determinations.  For the reasons that follow, I recommend that the Court **DENY** Massey 28 U.S.C. § 2255 relief.

### *Discussion*

For many of his claims Massey draws on the indictment and prosecution version principally to support an argument that these were the documents upon which he relied in entering his guilty plea and his contention that the sentence he received was more severe than it should have been based on the drug-quantity attributions of these key criminal pleadings.

Of the three-count indictment of Massey and two co-conspirators, the first is the only that pertains to Massey.  Count I provides:

> Commencing on or about January 1, 1996 and continuing to on or about October 31, 2001, in the District of Maine and elsewhere, the Defendants,
>
> <div align="center">DAVID TODD MASSEY<br>JOHN P. ROSS<br>GAYE B. PLUMADORE</div>
>
> knowingly, willfully, and intentionally conspired and agreed, together and with others known and unknown to the Grand Jury to commit an offense against the United States, that is to unlawfully, knowingly, and

---

transaction is outside the dates of incarceration reported at least in the pre-sentence report. But in any event, Massey withdrew his objection to quantity in district court. Sentencing Hearing at 2. For that reason alone, there is no "error" for us to correct. See United States v. Mitchell, 85 F.3d 800, 807 (1st Cir. 1996) (where there is valid waiver, there is no error to correct). Furthermore, even if all of the drug transactions which Massey disputes were to be subtracted from the court's finding of 934.64 kilograms of marijuana the remaining amount would still be above the 700 kilogram minimum for the same offense level of 30 that Massey was accorded. Therefore, in any event, we would find no error.

Fourth, Massey claims that his offense level should have been reduced by one more point for acceptance of responsibility. However, because Massey did not raise this issue in district court, he has forfeited it. See id. Where there is forfeiture, we apply a plain error analysis. See id. Here, we cannot say that the district court plainly erred in only awarding a reduction of two levels for acceptance of responsibility where Massey only pleaded guilty on the day of trial. For all [] these reasons, we summarily affirm the district court. Affirmed.

(Crim No. 02-68 P-H, Docket No. 86.)

intentionally distribute and possess with intent to distribute at least 100 kilograms of marijuana, a controlled substance listed in Section 812 of Title 21, United States Code.

All in violation of Section 841(a)(1), 841(b)(1)(B), and 846 of Title 21, the United States Code.

(Indictment at 1, Crim. No. 02-68-P-H, Docket No. 4.)

And the prosecution's version reads:

If the Government were put to its burden of proof at trial, it would introduce at least the following evidence to establish that Todd D. Massey committed the offense of conspiracy to distribute and possess with intent to distribute at least 100 kilograms of marijuana, as charged in Count I of the indictment, in violation of Title 21, United States Code, §§ 841(a)(1), 841(b)(1)(C), and 846.

Several cooperating co-conspirators and witnesses would testify, individually and in concert with each other, to at least the following facts:

1.     In the spring of 1996, Barry May, Scott Barbour, and Todd Massey, working together and with others, made at least six shipments packed in PVC pipes, each shipment containing at least 10 pounds of marijuana, from Houston, Texas to the Lewiston-Auburn area of Maine. [Note: A Houston Police Department police officer would testify that he and other law enforcement officers intercepted three such shipments in route to Maine, two which contained 25 pounds of marijuana each and the third containing four pounds of marijuana].

2.     In 1996, following the seizure of the PVC-pipe-packed marijuana, Mr. Massey and the other conspirators transported several shipments of marijuana, totaling approximately 150 pounds, by concealing the drugs in Volkswagen automobiles and driving them from Texas to Maine.

3.     In January 1998, Mr. May and a customer of the conspiracy flew from Maine to Houston and purchased at least 20 pounds of marijuana with the assistance of Mr. Massey, Mr. Barbour, and other members of the conspiracy.  Mr. May and the customer made a second trip to Houston for the same purpose and with the same results in February 1998.  [Note: The Defendant was arrested and detained on federal wire fraud charges in late January 1998, and was not, therefore, directly involved in the February transaction].

4.     Upon Mr. Massey's release from prison to a Houston halfway house in the spring of 2000, he worked with Mr. Barbour and other members of the conspiracy operating from a warehouse in Houston make [sic] regular shipments of marijuana to Maine for distribution during the summer of 2000.

5.     Beginning in or around December 2000 and ending in October 2001, Mr. Massey shipped or arranged to ship several hundred

pounds of marijuana from Houston to Mr. May and/or individuals designated by Mr. May for distribution in Maine.

A DEA agent and Mr. May would testify that: (1) Mr. May was arrested on October 12, 2001; (2) the arresting agents seized a parcel from Mr. May's residence containing $18,800 hidden inside a stuffed animal; (3) Mr. May told the agents that the money constituted drug trafficking proceeds that he had intended to send to Mr. Massey by UPS; (3) [sic]; under the directions of the agents, Mr. May placed a monitored, recorded call to Mr. Massey on October 12, 2001, to discuss the money and other shipments of marijuana; (4) during their conversation, Mr. May: (a) gave Mr. Massey the UPS tracking number for the parcel; (b) stated the words "18.8", to which Mr. Massey replied, "Okay"; (c) asked[,] "When are you going to doing any more", to which Mr. Massey responded, "Today"; and (d) asked[,] "How much", to which Mr. Massey replied, "Same as last". The Government would introduce a tape of this conversation at trial, as well as several tapes of telephone calls from Mr. Barbour to Mr. Massey during Mr. Barbour's incarceration in the Bureau of Prisons in 2001, in which they discuss the current status of the on-going marijuana operation.

(Corrected Judgment, Massey Prosecution Version at 1-3, Crim. No. 02-68-P-H, Docket No. 35.)

### Section 2255 Claims

### A.    Ineffective Assistance Claims

The United States Supreme Court articulated the two-prong standard for ineffective assistance claims in Strickland v. Washington, 466 U.S. 668 (1984).  Under Strickland:  "An ineffective assistance claim requires the defendant-who bears the burden of proof, Scarpa v. DuBois, 38 F.3d 1, 8-9 (1st Cir.1994)-to show (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that but for counsel's failures, the outcome would likely have been different." Cirilo-Munoz v. United States, 404 F.3d 527, 530 (1st Cir. 2005) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984) and Cofske v. United States, 290 F.3d 437, 441 (1st Cir.2002)).

### 1.     *Failure to subpoena witnesses for sentencing hearing*

Massey states that he asked his attorney to subpoena several witnesses for his April 22, 2003, sentencing to insure that they would attend but counsel merely sent letters to their attorneys requesting the testimony.  Massey names Barry May, Shane Hall, Kenneth Billings, Patrick Ward, Scott Barbour, and "others" as individuals who testified at co-conspirator Scott Barbour's trial and/or proffered information to the United States regarding drug quantity.  He argues that information from these individuals formed the basis for the drug quantity attributions in Massey's Pre-sentence Investigation Report (PSI).  Massey claims that there were many errors and discrepancies in their testimony and/or proffers and believes that had they been cross-examined at the sentencing hearing the amount of marijuana attributed to Massey "would likely have been drastically reduced."

In his addendum to his 28 U.S.C. § 2255 motion, Massey highlights the following examples of chinks in the prosecution's sentencing case that counsel could have exploited at the sentencing had the witnesses been subpoenaed:

- Counsel could have demonstrated that Barry May's testimony at Barbour's trial was 'impeached' by the United States so as that the truthfulness of May was "obviously in question."  (Mot. Vacate Addendum at 3; see also Mot. Vacate Attach. 8);
- There was the prospect that Kenneth Billings would have testified that Massey had no knowledge of or involvement with the 87.5 pounds of marijuana that Billings was arrested with in Tennessee;
- Counsel could have demonstrated that Pat Ward's testimony at trial and his proffer as to drug weight were "dramatically different";
- There was the prospect that Scott Barbour would testify that Massey had no knowledge of or involvement with the Billings 87.5 pounds of marijuana or a 100 pound transaction that took place while Massey was in FDC Houston;
- Counsel could have fleshed-out problems with a 10 ounce of cocaine transaction attributed to Massey;
- Counsel could have questioned Shane Hall on the many discrepancies, contradictions, and errors apropos his trial testimony and his proffer;

- And there was the prospect that John Ross would testify that Massey had no knowledge of or involvement with all the marijuana handled by this conspiracy during Ross's participation.

Massey points to a letter drafted by his attorney on March 11, 2003, in which Massey acknowledges that he wished to challenge the quantity of drugs and produce witnesses (even though this put his acceptance of responsibility reduction at risk); clearly, Massey argues, defense counsel was on notice that Massey had "adamant feelings about having witnesses present at the sentencing hearings." (Mot. Vacate at 2 & Attach 2.) Massey also contends that this Court should have recognized that there was a conflict of interest between Massey and defense counsel on the day of sentencing over the witness issue and (sua sponte) held a hearing on the conflict. (Mot. Vacate at 2-3 & Attachs. 3,4.) Massey states that it is clear from the pre-sentence conference and sentencing hearings that Massey withdrew his objection to drug quantity only because none of his witnesses were available to testify and that it was ineffective assistance for his attorney to counsel him to go this route.  Massey also asserts that counsel should have known that he had to subpoena these witnesses as they were all prosecution informants and that they would not show up simply on a written request.  Massey wants a new hearing at which he could invoke his Fifth and Sixth Amendment rights to cross-examine his accusers rather than letting his sentence stand on the basis of the testimony of government witnesses at Barbour's trial that was integrated into Massey's PSI.

The United States responds that counsel could have decided not to subpoena the witnesses "as a matter of sentencing strategy." (Gov't Resp. Mot. Vacate at 16.) It points to the pre-sentence conference of counsel at which Massey's attorney indicated that he had told his client that if the witnesses do testify that Massey would be in danger of

losing his acceptance of responsibility point reduction and of having the guideline range change based upon the testimony.  It also points to its brief in co-conspirator Barbour's direct appeal in support of the proposition that Ross's testimony might have added another 170 pounds of marijuana to the drug calculations.  (Id. at 16 & n.4 & Attach. 1.) The United States asserts that it was a reasonable strategy not to have the witnesses subpoenaed because the subpoena could be threatening to the witness so it was not unreasonable for counsel to attempt to negotiate the presence of witnesses through their attorneys.  (Id. at 16-17.)    It further contends that four of the witnesses were unavailable to testify because they were asserting their Fifth Amendment privilege to remain silent. (Id. at 17.)[2]

In his reply Massey argues that these witnesses were government informants who had cooperated with the prosecution and testified on several occasions.  (Reply at 4.)  He argues that the Fifth Amendment "could not attach to these witnesses" as they had already been sentenced based on their testimony and it was this testimony upon which Massey wanted his attorney to cross- examine them.

At the March 13, 2003, pre-sentence conference Massey's attorney explained to the Court that, "apparently Massey wants to call every witness that's ever been in this case," but "that's not going to happen no matter what he says."  (Mar. 13, 2003, Pre-sentence Conference Tr. at 3.)  The prosecutor indicated that he planned to have an agent testify and to buttress that testimony with the record that had already been established. (Id.)  Defense counsel responded:

---

[2]        The United States also argues that the fact that Massey withdrew his objection to drug quantity at the sentencing hearing removed "the entire basis for the witnesses' presence."  (Id. at 17-18.)  However, this is rather circular logic as it is evident that Massey acquiesced to the drug quantity because the witnesses did not appear.

> My position is obviously, that you know, the burden is on the government, I won't be able to cross-examine a transcript or even [the agent] because that's like multi hearsay, he's hearing it from other defendants. If [the prosecutor] wants, he wants to bring some of these people back, then I have the right to cross-examine them.
>
> Massey also has the problem as I told him that these people do come back, he's in danger of perhaps losing his acceptance, and he's in danger of guidelines changing based upon what they say. Also had him sign a document to that effect, that's what he wants, essentially what he's looking for...on the quantity issue here.
>
> ....
>
> ...But that's his biggest objection, Judge, is the fact that he wants people to come in. And I told him, it's very dangerous to have people come in because I don't know what they're liable to say, I don't know any of these people, you might lose your acceptance.
>
> You might actually be responsible for more quantity than you think you are, but if he's willing to take that chance, that's his business. I think they have to establish some record, you know, with the exception of just bringing a transcript in and having [an] agent read from the transcript.

(Id. at 4-5.)

The prosecutor then explained that he intended to call an agent to testify about the facts that had been incorporated apropos the co-conspirator's testimony to the extent that they were consistent with the investigation of Massey. (Id. at 5.) Defense counsel responded:

> My issue, Judge, is that he has a right to cross-examine these people on quantity, if he has six or seven or eight people [the prosecutor] can bring in to show that quantity, fine, I'll be able to cross-examine [them]. I'm not going to be able to get to cross-examine – I will be able to cross-examine [the agent] as some point in time, but I have no idea what these people are going to say if they take the stand. Massey wants them to come, get on the stand, and testify so I can cross-examine, that is his position.

(Id. at 6.)

The Court then noted that there were "two ways of framing this issue." (Id. at 6.) "One, if the government chooses not to call them," the Court reflected, "as it's indicated it won't, of course you're free to argue from the defense point of view that I should discount

the testimony of the [the agent] because it is hearsay."  (Id.)  "There's a separate question, however," the Court continued, "from you on Mr. Massey's behalf wanting to call them as your witnesses, hostile or not, and put them on the stand."  (Id. at 7.)  Massey's attorney responded: "I think he'll want to call the witnesses.  I have to list them and put them on.  He knows full well what the dangers are."  (Id.)  Asked how long counsel thought his testimony would take, Massey's attorney responded that he was unsure as he did not know these people and added that he felt that he had the obligation to check with the clerk's office and find out who their attorneys were and to write them a letter.  (Id.)  "They may say no," counsel conceded.  (Id.)  He added, "I'd be very surprised if these people say yes, it's okay,.... I think they're going to listen to the lawyers, I don't think any of these people are going to testify.  I'd be very surprised if anybody, but I'll get a letter out immediately to these people and keep the court informed."  (Id. at 8.)

The record in Massey's criminal case includes an April 1, 2003, letter from Massey's attorney to the court which indicates:

> On March 14th a letter was sent to six attorney[]s who represent other defendants who have already been sentenced in this case.  I have heard from three of the attorney[]s as of this date, the attorney[]s represent Pat Ward, Scott Barbour and Kenneth Billings.  They will not be testifying for Mr. Massey.  I have given the attorneys until today, April 1st. (See enclosed).  As I said in my letter, that no response means they [will] not testify on behalf of Mr. Massey.  This is the reason that the time [for sentencing] should be cut down from a half a day to two hours.

(Apr. 1, 2003, Letter to clerk, Crim. No. 02-68-P-H, Docket No. 52.)

At the pre-sentence conference on the afternoon of April 22, 2003, defense counsel explained that now a total of four of the attorneys to whom he had sent letters had called him to let him know that they would not allow their clients to testify and that,

9

as the others did not respond, he assumed that they would not testify. (Apr. 22, 2003, Pre-sentence Conference Tr. at 2.) Counsel went on:

> Mr. Massey wants to withdraw his objection on the quantity for the reason that he feels, he wanted me to put it on the record, he won't be able to cross-examine anybody. The burden of proof is on the government, and apparently they have [an agent] to testify from the transcript. I can't cross-examine any of those people because they are not present. As I said, the defendant will withdraw his objection on quantity for the reason that I can't cross-examine anybody. And I don't have to produce anybody, the government does. We will have no witnesses other than the right of allocution.

(Id.) The prosecutor indicated that if there was no objection to drug quantity then he had nothing to proffer; its position on drug quantity would be "as written in the PSI." (Id. at 3.) Defense counsel asked the Court to address this question with Massey in open court (id. at 3), and the prosecutor suggested that if Massey responded that he wanted to contest the drug quantity the United States would need a continuance to prepare its agent (id. at 4).

The Court stated:

> All right. As I understand now, where I think we are, I will inform the defendant that the record is the presentence report at the moment. If he objects to the drug quantity, the government will introduce drug quantity and sustain that through a drug agent but not today, and then his attorney would have the right to cross-examine that agent. And I understand from his attorney that he would attempt to find other witnesses but that he had been unsuccessful or they are not willing to testify.

(Id. at 4.)

At the sentencing that followed the Court explained to Massey:

> I met with your lawyer and the prosecutor in my office before we came here, and the prosecutor has told me that the prosecution is not pursuing an increase for role in the offense and they are also not trying to hold you on the Shane Violation but are willing to let you have the acceptance of responsibility. That is what we are talking about.

> So the drug quantity is the one remaining issue.  What I have right now, the record consists of the presentence report as amended.  If you challenge the presentence report as amended, then the prosecutor will attempt to establish drug quantity by calling the case agent to testify. Your lawyer will cross-examine him if he wishes to.  Your lawyer has told me in the office, and I will say that to you here, he has not been able to get any other witnesses, that other witnesses he attempted to contact through their lawyers have either refused to testify under the [F]ifth [A]mendment, for self incrimination reasons, or have not responded.
>
> So the question right now is whether we schedule the sentencing hearing in which the government will call the case agent to take the stand, subject to cross-examination or not.

(Apr. 22, 2002, Sentencing Tr. at 10-11.)  The Court then recessed to allow Massey to confer with his attorney.

A conference of counsel in chambers followed.  Defense counsel indicated that Massey wished to argue that he had a minor role and wanted the Court to say on the record that Massey's quantity objection was withdrawn because he could not cross-examine anyone that day.  (Id. at 11.)  The prosecutor insisted that he wanted Massey himself to say "the magic word that he is withdrawing his objection, as long as it is clear that he is withdrawing his objection to drug quantity, that relieves the government of its burden." (Id. at 11-12.)  "In all candor," the prosecutor predicted, "Mr. Massey concerns me more than some other defendants, that unless we make the record very clear in this case, he will create an issue."  (Id. at 12.)

Reconvening in open court, the exchange was as follows:

> The Court:      Mr. Massey, your lawyer has spoken with me and the prosecutor in my office .... And I'm left somewhat uncertain as to what your position is on drug quantity, so why don't you tell me. ...
> Massey:         Well, your Honor, I feel that it would be an exercise in futility for us to cross-examine somebody that is testifying to what somebody told him.  [My attorney] sent them letters, they refused to be here, so we can't cross-examine anybody on quantity.  We are compelled to withdraw the objection to quantity due to the fact that we can't cross-

examine anybody on it.  There would be, it would be double hearsay basically.

The Court:      Let me make sure that I understand what you're saying and that you understand what I'm saying.

Right now what I have is a presentence report and it has things in it about drug quantity.

If there is no challenge to that drug quantity, that is the drug quantity that I will use under the guidelines.

If you do challenge that drug quantity then the prosecution will try to prove the drug quantity and the way they're going to do it, the prosecutor told me, is by calling the case agent, examine him under oath, and [your attorney] on your behalf, has a right to cross-examine him under oath.  The prosecutor has told me that he does not plan to call any other witnesses except the case agent.

You have the right to call witnesses if they are willing to testify.  Your lawyer has told me, and I gather he has told you, that some of them, most of them I gather through their lawyers have refused to testify and from a couple of them he has not heard a response.

That is where we stand at the moment.

Massey:         Right.

The Court:      This is what we call an adversary system.  I don't get to control how it goes, the prosecution gets to decide how he will put on his case and you get to decide how you put on your case.  I end up deciding whether the prosecution has met its burden of proof to persuade me that the quantity is some smaller amount; do you understand what I have just told you?

Massey:         Absolutely.

The Court:      In light of what I have just described, are you telling me that you do not wish to challenge the drug quantity?

Massey:         We withdraw our objection to quantity, your Honor, due to the fact that we can't cross-examine.

The Court:      When you say "can't cross-examine", you mean under the circumstances?

Massey:         Yes.

Defense Counsel:      It does not mean he does not have the ability but that is where it stands.

The Court:      I understand.  Very well, then I understand the drug quantity challenge to be withdrawn.

(Id. at 14-16.)

The above replay of  the pre-sentence and sentencing 'action' apropos the question

of the defense's ability to put on witnesses at Massey's sentencing demonstrates defense

counsel's conscientious efforts to advocate vis-à-vis Massey's desire to call various

witnesses to impeach the prosecution on the drug quantity attributions in the PSI while at the same time limiting Massey's sentencing exposure.  Ultimately, with Massey dropping his objection to drug quantity, the United States did not seek the enhancement for role in the offense (there was no role reduction) and this Court subtracted two levels from Massey's offense for acceptance of responsibility.  (Id. at 23.)  Contrary to Massey's contention, the witnesses he envisioned calling were entitled to invoke their rights against self-incrimination under the Fifth Amendment so counsel would have generated aggravation rather than advantage by issuing subpoenas to those witnesses that had indicated that they would invoke their Fifth Amendment rights.  And, as the United States points out – and Massey's own examples of the testimony he would have had counsel elicit evidence -- even if counsel could have secured these witnesses for the hearing their testimony would have been of questionable benefit to Massey and of possible detriment; Strickland counsels that counsel must have "wide latitude ...in making tactical decisions." 466 U.S. at 689.

### 2. *Failure to raise an objection to drug quantity*

Massey argues that counsel's failure to object to the attribution of higher quantities of marijuana at sentencing-- when counsel knew that Massey believed he was pleading guilty to 100 to 400 kg of marijuana and was insisting on a sentencing hearing -- was a shortfall of constitutional proportions.  Massey states that the indictment and the prosecution version confirmed that he was responsible for 100 to 400 kg and that this was the premise of his plea.  (Mot. Vacate at 6 & Attachs. 6,7.)  Massey claims that at his co-defendant's trial the key government witness was impeached on the government's own examination and it was this impeached testimony that probation relied on to calculate

Massey's marijuana attribution.  He points out that the argument on drug quantity was put on the record by defense counsel in the objections to the pre-sentence report so counsel cannot claim he was uninformed of the information.  (Id. at 6.)  He contends that the transcript of the pre-sentence conference "clearly shows that defense counsel was deficient and did not have Massey's best interest at heart."  (Mot. Vacate at 7 & Attach. 4.)

The transcript of the testimony that Massey attaches to show the government's 'impeachment' is the redirect examination of May at co-defendant Barbour's trial.  The transcript reveals that May reported having better recollection of what happened during the conspiracy at the time of this trial than he had when he had met with the prosecution earlier in the investigation.  (Mot. Vacate Attach. 8 at 196.)  May is equivocal, perhaps evasive, when the prosecutor questioned him about the quantity of marijuana in certain packages he handled and the frequency of shipments he received from August 1999 and May 2000.  (Id. at 196-99.)  In this testimony May, when pressed on a quantity question, indicated about the report by agents of a conversation with May: "I mean, they wrote in what they wanted to write, I may have said 30 to 50 pounds, they might have wrote in 50 pounds."  (Id. at 199.)  May also contradicted his earlier proffer with agents concerning whether or not he picked up money from his cousin Michael May and delivered it to Tina Barbour.  (Id. at 200-02.)  Finally, asked whether he remembered telling agents that Barbour had been in the operation from the beginning, May responded:

> That – I may have said that, yes, I probably did say that. I don't remember.  I honestly, like I said, you know, I don't remember a lot of stuff that I said yesterday.  So I mean, you want to get my girlfriend in here, she'll testify to it, just recently – not recently, a few months ago I'm sending $2,000 extra money to creditors that I don't even owe them, just

14

things that I forgot that I had already sent them money, whatever. I'm not
the best when it comes with this memory stuff.

(Id. at 203-04.) "Are you saying," the prosecutor followed-up, "we can't rely on your

testimony today?" (Id. at 204.) And May responded:

> I'm not saying you can't. I am not the best. I—I don't know. Did I
> or did I not, I didn't remember this until you showed it back to me this
> morning, you had showed it to me last week. I honestly forget all about it
> until you showed it to me. I'm not---

(Id.) The prosecution assuaged May with "That's all right," and May asked, "Can I

leave?" (Id.)

Unlike Massey, I do not see this testimony as the type of material that counsel

could have exploited to undermine the United States' drug quantity attributions vis-à-vis

Massey. May, while demonstrating a want of memory in this testimony, does not

concretely counter the government's evidence of drug quantity in a way that would have

convinced this Court in reviewing the PSI that the drug quantities were meaningfully

exaggerated.

In addition, the discussion with respect to Massey's first ineffective assistance

ground documents, at least part of, counsel's able efforts to advocate for a lower drug

quantity attribution. Furthermore, as Massey points out, counsel lodged numerous

objections to the initial PSI's attribution of drugs to Massey which was proper advocacy;

the reality that he could get no witnesses to testify at sentencing was beyond counsel's

control and this reality caused Massey's attorney to not press the question of amounts

further, not a deficiency in counsel's performance.

### 3.    *Two plea-related grounds: Failure to negotiate a proper plea, instead advising Massey to sign an open plea, and counsel's pre-plea conference conduct*

Massey states that on the morning of trial his attorney advised him to sign an open plea which gave the prosecution the opportunity to drastically increase the drug quantity upon which he would be sentenced.  He faults counsel for not attempting to seek any kind of cap or ceiling during the plea negotiations.  Massey believes that the plea negotiations were completed on the Friday before his Monday trial but counsel did not inform him of them until the morning of his trial.  (Mot. Vacate at 7 & Attach. 11.)  Massey also believes that counsel negotiated the open plea because it benefited Massey's co-defendant and common-law wife, Ms. Plumadore.  Massey opines that he is entitled to counsel whose individual loyalties lie with the client: "Obviously, defense counsel's loyalties did not, when he repeatedly advised Massey to plea to an open plea in order to get a better deal for Plumadore."  (Mot. Vacate at 8.)[3]   Finally, counsel should have, Massey believes, investigated the mitigating circumstance of the relevant conduct and Massey's true sentencing range prior to advising him to take an open plea.[4]

In a separate ground Massey also faults his attorney for revealing privileged communications between Massey and counsel at the conference of counsel involving both Massey and Plumadore's counsel that preceded his change of plea. Massey argues that, although Massey did end up pleading guilty, if the plea agreement had fallen through these revelations would have "extremely adversely affected this case."  (Mot. Vacate at 11.)

---

[3]    In Massey's view counsel should have at least filed a motion to suppress and then entered a conditional plea but Massey does not identify the basis for such a suppression motion.

[4]    He asserts that counsel gave him incorrect sentencing information in contemplation of the plea, indicating to Massey that he would be sentenced per a 100-400kg of marijuana drug attribution.  I address this contention when I address another of Massey's ineffective assistance claims below.

The conference of counsel discussion in question was as follows:

Plumadore's counsel:  The second thing I want to state for the record, and I'm asking [the prosecutor] to respond to, this might become relevant later on at sentencing, I'm not sure at this point, but I want to make clear for the record, it was our side, it was my client that spurred these plea negotiations.  It's my client who essentially engineered Todd Massey's plea in this case.  I understand she's gotten some consideration for that already, but I just want to state for the record that that is what happened in this case.

Prosecutor:     The – I got a call from [Plumadore's counsel] Friday evening, laid out this disposition, and it was specific in our discussions that Ms. Plumadore's agreement was contingent upon her bringing in Mr. Massey and him pleading straight up.  So I have every reason to believe that's exactly what happened.

The Court:  Well, let me pursue that a little bit.  You use the term engineer, you said contingent.  What is the relationship between the two of them?  Do I need to be concerned at all in terms of Mr. Massey and his –

Massey' counsel:        Mr. Massey is pleading guilty, Judge, because he is guilty, that's the long and the short of it.

The Court:       Is there any relationship, they were co-conspirators allegedly.

The prosecutor:         They have a child together.

Massey's counsel:      They have a child together.  [Plumadore's counsel] called me, like three or four different phone calls, sort of enlightened Mr. Massey the way things were, and indicated to him what I thought, that I didn't think the case was winnable, I thought he was guilty anyway, and he told me that he was guilty.  And as far as this contingent, Mr. Massey is pleading guilty on his own merits, he'll go through a Rule 11 that way.

(Conference of Counsel, Nov. 18, 2002, Tr. at 3-5, Crim. No. 02-68-P-H.)

With respect to Massey's claim that his attorney should have brokered a better plea deal, the United States directs the Court's attention to the representation by Plumadore's attorney that his client (and not Massey's counsel) was the moving force behind Massey's decision to plead open.  It also argues that these representations document that "the Government would accept only a 'straight up' plea and a cap on the sentence was apparently non-negotiable."  (Resp. Mot. Vacate at 19.)[5]   Apropos the

---

[5]        The United States also asserts that, as Plumadore was the mother of Massey's child, "his willingness to plead guilty 'straight up' seems to have been motivated by that circumstance and not by any

disclosure of confidential information the United States opines that the comments were made to reassure the Court that Massey intended to enter a guilty plea because he was actually guilty and were not an innocent man's efforts to help Plumadore, the mother of his child.  (<u>Id.</u> at 25.)  And, it expounds, "even if counsel went too far, there was no prejudice" because the Court was required to satisfy itself that Massey entered the plea because he was guilty.  (<u>Id.</u>)

The two-part <u>Strickland</u> test applies to ineffective assistance claims pertaining to the plea process.  <u>Hill v. Lockhart</u>, 474 U.S. 52, 58-59 (1985).  Contemporaneous with Massey's plea the prosecutor seems to make it clear that there were to be no negotiations with Massey for anything other than a straight-up plea, although the focus of the exchange was on what Plumadore had to do to achieve a plea agreement.  Breach of confidentiality concerns aside, Massey's attorney's representations to this Court do make it clear that he was exercising his professional judgment when he advised Massey to plead because counsel earnestly believed that he did not have a chance of prevailing at trial.  "Because advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be respected in these circumstances if they are based on professional judgment."  <u>Strickland</u>, 466 U.S. at 681.  Massey was always free to reject counsel's advice.  With respect to the breach of confidentiality, the hypothetical chance that the disclosure might, but did not, come back to haunt Massey is not the type of measurable prejudice that satisfies the second prong of <u>Strickland</u>.

---

deficient performance of his attorney."  (<u>Id.</u>)  I see that as a bit of a dubious inference to draw on the basis of this interchange alone.

### 4. *Misinforming Massey about his sentencing exposure due to drug quantity*

Massey claims that defense counsel told him the day that he changed his plea[6] that he was pleading guilty to an indictment of at least 100 kg of marijuana and a prosecution's version of several hundred pounds of marijuana.  Yet, when Massey first viewed the pre-sentence report he discovered that thousands of pounds of marijuana had been added vis-à-vis relevant conduct.  Defense counsel told him, Massey claims, that if he pled guilty the prosecution would seek a sentence reflecting a range of 220 to 880 pounds of marijuana.[7]  It is obvious, Massey asserts, that he did not enter into his plea "in a 'knowing, intelligent, and voluntary' fashion." (Mot. Vacate at 9-10.) [8]

The United States notes that this Court informed Massey at the time he changed his plea that Massey could face as much as forty years and Massey responded that he understood this exposure.[9]  It also argues that the record demonstrates that Massey knew at the time of plea that the Court alone would make the drug quantity determination and that this would be based on the contents of the PSI.

What Massey does not appreciate is that he entered a plea to being part of the conspiracy and that if he had gone to trial and was found guilty then it would have been for the Court to make the drug quantity determination in the same manner it did after the

---

[6]     Massey identifies this date as April 22, 2003, but that was actually the date of sentencing.  The change of plea occurred on November 18, 2002.

[7]     Massey asserts that counsel should have negotiated a plea that pinned the government down as to drug quantities and that he would not have pled guilty if he had known the prosecution would seek to expand the marijuana amounts.  I have already noted that the record demonstrates the prosecution's unwillingness to negotiate a plea agreement.

[8]     He adds that the PSI preparer's "unbridled power" to impact Massey's sentence was totally inconsistent with the plea agreement but there was no plea agreement as to drug quantity.

[9]     The United States' first line of attack is that there was no agreement as to drug quantity, and points to the moments in the Rule 11 proceeding that Massey acknowledges that there is no agreement.  However, footnote 8 aside, Massey is not arguing that there was an agreement between defense and the prosecution on drug quantities but that counsel should have obtained an agreement.

guilty plea.[10]  At the change of plea hearing Massey, while not admitting that he was responsible for over 900 kg of marijuana, did admit that he was guilty of conspiring to distribute at least 100 kg of marijuana.  (Nov. 18, 2002, Rule 11 Tr. at 5.)  That is all that the jury would need to have agreed upon to find Massey guilty.  As Massey admits that at least 100 to 400 kg could have been properly attributed to him, there was no prejudice to Massey in entering the plea as opposed to proceeding to trial.

###### 5.    *Counsel's absence from Massey's pre-sentence interview*

Massey states that the pre-sentence interview was arranged by defense counsel but when the probation officer arrived Massey and the officer were surprised to find that defense counsel was not there.  After the two waited patiently for a period, according to Massey the officer stated, "I really don't want to do this without your lawyer here, but I have a schedule to keep.  The judge ordered this to be done."  (Mot. Vacate at 10.) Massey states that he proceeded reluctantly with the interview.  He notes that he had a right to counsel at every critical stage of the prosecution and he believes that this interview about Massey's role in the conspiracy might quite possibly have been the most critical stage other than pleading guilty.    Yet, defense counsel left him "hung out to dry' so to speak."  (Id. at 11.)

The United States responds that the probation officer is a neutral party who simply gathers information and that there is no Sixth Amendment right to counsel during a pre-sentence interview.  (Resp. Mot. Vacate at 24.)   It also faults Massey for not indicating how counsel's presence would have altered the outcome of that meeting or changed his sentence.  (Id.)

---

[10]      I address Massey's argument that he had a right to a jury determination of drug quantity below. (See, infra, B.)

While the First Circuit has not spoken on the question, I conclude, following decisions in several other circuits, see United States v. Benlian, 63 F.3d 824, 827 (9th Cir. 1995) (concluding that "presentence interview is not a critical stage of the adversary proceedings, whether viewed in the context of pre- or post-Guideline law" and rejecting the Sixth Amendment claim); United States v. Gordon, 4 F.3d 1567, 1572 (10th Cir. 1993) ("Because the probation officer does not act on behalf of the government, we join those circuits that have concluded that the presentence interview is not a critical stage of the proceeding within the meaning of the Sixth Amendment."); United States v. Tisdale, 952 F.2d 934, 940 (6th Cir. 1992) ("Although the Sentencing Guidelines have increased the importance of the probation officer's report, in non-capital cases such as this one the presentence interview does not represent a 'critical stage of the prosecution.'"); United States v. Jackson, 886 F.2d 838, 845 (7th Cir. 1989) ("We conclude that the sixth amendment right to assistance of counsel did not extend to Jackson's presentence interview by the federal probation officer."); Brown v. Butler, 811 F.2d 938, 941 (5th Cir. 1987) ("Brown was interviewed by a probation officer, who is an arm of the court charged with assisting the court in arriving at a fair sentence. We conclude that such an interview is not a critical stage of the proceeding in which counsel's presence or advice is necessary to protect the defendant's right to a fair trial. The district court did not err in rejecting this [Sixth Amendment] claim."); see also United States v. Hooks, Docket No. 04-00009-CR-T-N, 2005 WL 2219240, *3 (11th Cir. Sept. 14, 2005) (unpublished slip opinion) (noting that appellant has not cited any binding authority holding that a defendant's Sixth Amendment right to counsel applies to presentence interviews by the court's probation office, recognizing that a prior 11th Circuit case declined to address the

waived argument but noted that three circuits have rejected such Sixth Amendment claims, concluding that it did not need to address this issue); cf. United States v. Johnson, 935 F.2d 47, 50 (4th Cir. 1991) ("In declining to find that a right to counsel attaches during a presentence interview, courts have reasoned that a probation officer is an agent of the court and assists the court in arriving at a just sentence. Brown v. Butler, 811 F.2d 938, 941 (5th Cir.1987). We find this reasoning, persuasive in the case of a presentence interview, compelling when applied to appellants' claim of a right to counsel during an ex parte presentence conference."), that Massey had no Sixth Amendment right to counsel at his pre-sentence interview.

**B.      The Court's Sentencing 'Misinformation' and the Court's Drug Quantity Determination**

Massey argues that this Court misinformed him at the sentencing hearing that the Court would be the one to decide the amount of drugs attributable to Massey. Massey states that this is erroneous information that does not adhere to the Sixth Amendment. Massey should have been told that he was entitled to a sentencing hearing in which a jury would have to find drug quantity by proof beyond a reasonable doubt. Massey argues: "The court[']s instructions and sentencing scheme violated the right for the defendant to have a jury find the existence of any particular fact that the law makes essential to his punishment." (Mot. Vacate at 14.)

In a separate, but closely linked, ground Massey posits error in the Court's attribution of 934.64 kg of marijuana to him when the indictment and the prosecution's version upon which Massey pled guilty did not specify a specific drug quantity. Massey explains that he was one of two of the co-conspirators that changed his plea at the same time (the other being Plumadore). "Perhaps because of this circumstance," Massey

22

suggests, "the proffer made by the government at the appellant's change of plea was conspicuous for its scantiness." (Mot. Vacate at 16.) Massey complains that the prosecutor only indicated that Massey had been a member of a conspiracy which delivered several hundred pounds of marijuana to Maine, never alluding to specific drug quantities. Massey believes that the Court "applied a per se rule, automatically attributing to him the full amount of drugs charged in the pre-sentence report." (Id. at 17.) This judicial fact-finding, Massey asserts, based on the drug quantities attributed in the PSI, is no longer allowed under Apprendi v. New Jersey, 530 U.S. 466 (2000), Blakely v. Washington, 542 U.S. 296 (2004), and United States v. Booker, __ U.S. __, 125 S. Ct. 738 (Jan. 12, 2005). Citing Massey's obvious discontent during the sentencing with his inability to cross-examine witnesses, Massey argues that had the Court realized its obligations under the rule of these cases it would have been the United States that bore the responsibility for getting the witnesses it needed to prove drug quantity and they would not have been able to rely on a single drug enforcement agent. (Id. at 18.) Massey calculates that if he was sentenced based on the amount of drugs he acknowledged in his change of plea – several hundred pounds of marijuana which Massey equates to 100 to 400 kgs – then he would have received a middle of the guideline range sentence of eighty-seven months, which is thirty-five months shorter than the sentence he received. (Id. at 19.)

To the extent that Massey is mounting a 'straight up' challenge to this Court's drug quantity determination, Massey did raise one challenge to drug quantity in his direct appeal, apropos which the First Circuit stated:

Massey's third claim, that he was held responsible for certain transactions at a time when he was jailed, appears to be unsupported by the record

> because each transaction is outside the dates of incarceration reported at
> least in the pre-sentence report. But in any event, Massey withdrew his
> objection to quantity in district court. Sentencing Hearing at 2. For that
> reason alone, there is no "error" for us to correct. See United States v.
> Mitchell, 85 F.3d 800, 807 (1st Cir. 1996) (where there is a valid waiver,
> there is no error to correct). Furthermore, even if all of the drug
> transactions which Massey disputes were to be subtracted from the court's
> finding of 934.64 kilograms of marijuana the remaining amount would
> still be above the 700 kilogram minimum for the same offense level of 30
> that Massey was accorded. Therefore, in any event, we would find no
> error.

United States v. Massey, Corrected Judgment, No. 03-1611 (1st Cir. June 21, 2004).  Not

only has the First Circuit already concluded that Massey's withdrawal of his objection to

drug quantity means there is no error to correct, as a challenge solely to this Court's

sentencing calculation the claim is not subject to 28 U.S.C. § 2255 review:

> The Supreme Court has repeatedly emphasized that § 2255 is not a
> substitute for direct appeal. See, e.g., United States v. Frady, 456 U.S. 152,
> 165 (1982); [United States v.] Addonizio, 442 U.S. [178,] 184-85
> [(1979)]; Sunal v. Large, 332 U.S. 174, 178(1947). A nonconstitutional
> claim that could have been, but was not, raised on appeal, may not be
> asserted by collateral attack under § 2255 absent exceptional
> circumstances. See Stone v. Powell, 428 U.S. 465, 477 n. 10 (1976);
> Suveges v. United States, 7 F.3d 6, 10 (1st Cir.1993) (applying cause and
> prejudice standard to procedural default of jurisdictional claim).

Knight v. United States, 37 F.3d 769, 772 -73 (1st Cir. 1994).

With respect to his Apprendi/Blakely claim, Massey did not raise this claim

during sentencing or on direct appeal.  The most he could have hoped for had he raised

the claim in a direct appeal is "plain error" review and he would have been quickly

rebuffed because this Court was acting in conformity with post-Apprendi, pre-Blakely

circuit precedent when conducting Massey's sentencing hearing.  See United States v.

Morgan, 384 F.3d 1, 8 (1st Cir. 2004).  Massey certainly is not entitled to 28 U.S.C.

§ 2255 relief on the basis of Apprendi or Blakely.

With respect to a <u>Booker</u> claim, Massey did not seek review by the Supreme Court of the First Circuit's order denying his appeal.  The corrected judgment on the appeal was entered in June 2004.  His case became final well before the issuance of <u>Booker</u> on January 12, 2005.  The First Circuit "held that petitions under 28 U.S.C. § 2255 are unavailable to advance <u>Booker</u> claims in the absence of a Supreme Court decision rendering <u>Booker</u> retroactive." <u>United States v. Fraser</u>, 407 F.3d 9, 11 (1st Cir. 2005)(citing <u>Cirilo-Munoz v. United States</u>, 404 F.3d 527 (1st Cir. 2005)).  <u>See also id.</u> ("[W]e have said there is nothing fundamentally unfair in the use of judge-made findings of fact." <u>United States v. Antonakopoulos</u>, 399 F.3d 68, 75 (1st Cir.2005).").

## C.    The Court's Impositions of a Special Condition of Supervised Release and Defense Counsel's Failure to Object to the 'No Contact' Condition

In his final 28 U.S.C. § 2255 ground Massey takes aim at this Court's imposition of the special condition of supervised release discussed above apropos counsel's performance as to this condition.  He explains that under Texas common-law marriage statutes Massey and his co-defendant Gaye Plumadore are (and since 1998 have been) common-law spouses.  (Mot. Vacate at 21.)  He describes his right to his intimate and private relations as a fundamental element of liberty.  He also invokes the First Amendment.  Massey explains that "a legal marital relationship cannot be sporadic." (<u>Id.</u> at 22.)  Massey requests that the special condition of no communication or contact with Plumadore be removed from the April 22, 2003, judgment.

And the one ineffective assistance claim yet to be addressed targets counsel for not objecting to the imposition of this condition.  Massey relays that during the pre-sentence conference this Court informed counsel that he was to speak with Massey and should be ready to address the no contact issue vis-à-vis Massey and Plumadore at

sentencing.  However, Massey complains, counsel did not speak with Massey about this condition and did not address the issue at sentencing.  Massey claims he was "blind sided" by the Court's no contact rule, asking counsel if the Court could really do that. Massey reports that counsel responded, "No, don't worry about it."  (Mot. Vacate at 8.) He reports that Plumadore and he have been common-law spouses for seven years and that they had every intention of continuing their marriage after incarceration.

As to the 'straight up' claim, the United States responds that Massey has defaulted this claim because he did not raise it on direct appeal.  It relies on Massaro v. United States which reiterated "the general rule that claims not raised on direct appeal may not be raised on collateral review unless the petitioner shows cause and prejudice."  538 U.S. 500, 504 (2003).  The United States argues that Massey has not made a showing of cause and prejudice and cannot meet the other grounds for excusing procedural default, that of actual innocence.  See Bousley v. United States, 523 U.S. 614, 622 (1998).  It states that the Court unambiguously stated the condition during sentencing but Massey did not object at the time or on appeal.  In stating that there is no showing of cause, the United States overlooks the presence of the ineffective assistance claim in which Massey faults his counsel for not making such an objection.

With respect to the legitimacy of the condition, the United States describes the condition as "totally proper."  (Resp. Mot. Vacate at 30.)  It points to Plumadore's addition of a cell phone account for Massey to her account as proof that she was providing Massey with the tool to return to active participation in the conspiracy.  It also notes that Plumadore continued to pay Massey's cell phone through the end of the conspiracy.  The United States claims, further, that Plumadore was subject to Massey's

direction apropos criminal conduct even while he was incarcerated.  Citing to the Court's authority under 18 U.S.C. § 3553(a)(1) and (2) and its discretion under United States Sentencing Guideline § 5D1.3(b),  it argues that Massey has not shown that "the condition is sufficiently divorced from the nature and circumstance of his offense."  (Id. at 31; see also id. at 21.)  It suggests that the criminal records of Massey and Plumadore evidence that they were cooperating closely in the conspiracy and conjectures that it is "likely that, upon release, Massey and Plumadore could well be involved in criminal activity once again if they are permitted to associate with one another."  (Id. at 31-32; see also id. at 21.)  With regards to the ineffective assistance claim, the United States asserts that because the imposition of the condition was reasonable, "Massey's attorney was not remiss in failing to object to the special condition because it was entirely proper."  (Id. at 21.)  "Further," the United States opines, "if the special condition was imposed properly, then counsel's failure to object did not prejudice Massey because such an objection would not have had any likelihood of success."  (Id. at 21-22.)

        At the March 13, 2003, pre-sentence conference, the Court commenced by indicating that,

            the probation officer here is recommending restriction on the
            contact between Mr. Massey and Ms. Plumadore, limited to the child that
            they have in common.  So you ought to discuss that with your client, be
            prepared to address that if you wish.  That is something I want to be sure
            you're prepared to address at sentencing.

(Mar. 13, 2002, Pre-sentence Tr. at 2.)  At sentencing the Court indicated that Massey "shall have no communication or contact with co-defendant Gay Plumador[e], except with respect to their shared minor child."  (Apr. 22, 2002, Sentencing Tr. at 26.)  There was no further discussion of the condition.

With respect to Massey's 'straight up' challenge to the imposition of this condition of supervised release it is clear that this Court had the authority to impose such a condition, even though it might implicate a fundamental right, if it concluded that it was "reasonably related" to the factors identified in 18 U.S.C. § 3553(a) and United States Sentencing Guideline § 5D1.3(b).  See United States v. Myers, __ F.3d __, 2005 WL 2364943, *4 -8 (2nd Cir. Sept. 27, 2005); United States v. Loy, 237 F.3d 251, 256 (3d Cir. 2001); United States v. Bolinger, 940 F.2d 478, 480 (9th Cir. 1991).  At the sentencing neither counsel nor Massey challenged the imposition of this condition despite this Court's efforts to red flag the issue at the pre-sentence conference.  Accordingly there was no reason for the Court to undertake the inquiry.  Of course, Massey is arguing that counsel should have, but did not, discuss this condition with him and should have, but did not, challenge the condition at sentencing.  With respect to the Strickland inquiry, counsel may well have concluded that it was not necessary to roil the sentencing waters by raising such a challenge at the time (especially in view of the perhaps nebulous status of his asserted common law marriage to Plumadore) because of the ability of Massey to challenge the condition at a later date.  See Meyers, 2005 WL  2364943 at *7 ("The trial court may modify conditions of supervised release at any time pursuant to 18 U.S.C. § 3583(e)(2), see United States v. Johnson, 529 U.S. 53, 60 [(2000)]('The trial court, as it sees fit, may modify an individual's conditions of supervised release.'); see also Fed. R. Crim. P. 32.1(c) (generally requiring a hearing before modification of conditions).  Meyers may also move the trial court for a modification of the conditions if circumstances change. See Johnson, 529 U.S. at 60 ('Respondent may invoke § 3583(e)(2) in pursuit of relief.'). Facts and relationships may change over the years, and

the district court may wish to re-examine the special conditions at a time closer to Meyers's release, when more facts will be clear.").  Furthermore, Massey's ability to yet move for a modification of this condition undermines his claim that he suffered Strickland prejudice from counsel's alleged lassitude.  And, in the final analysis, this Court as the sentencing court is in the best position to determine if Massey was prejudiced by counsel's failure to lodge the challenge during the sentencing proceedings. See McGill, 11 F.3d at 225 (observing that, when, a "petition for federal habeas relief is presented to the judge who presided at the petitioner's trial, the judge is at liberty to employ the knowledge gleaned during previous proceedings and make findings based thereon without convening an additional hearing").

### Conclusion

For these reasons I recommend that the Court **DENY** Massey 28 U.S.C. § 2255 relief.

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

October 12, 2005.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge